IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

AIMEE W.,

      **Plaintiff,**

**v.**                             **Case No.: 2:23-cv-00025**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be

**AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On January 24, 2020, Plaintiff Aimee W. ("Claimant") protectively filed for DIB, alleging a disability onset date of May 23, 2019 due to "[COPD], asthma, breast cancer remission, hypothyroidism, hypertension, low serum cortisol levels, anxiety, and arthritis." (Tr. at 1114, 1147). After the Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration, Claimant filed a request for an administrative hearing, which was held on March 8, 2022 before the Honorable Francine A. Serafin, Administrative Law Judge (the "ALJ"). (Tr. at 962-80). By written decision dated May 3, 2022, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 49-74). The ALJ's decision became the final decision of the Commissioner on November 21, 2022 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action, seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a Transcript of the Administrative Proceedings. (ECF No. 6). Claimant filed a Brief seeking judgment on the pleadings, (ECF No. 11), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12), to which Claimant filed a reply, (ECF No. 13). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 47 years old on her alleged disability onset date and 50 years old on the date of the ALJ's decision. (Tr. at 67). She completed two years of college, communicates in English, and previously worked as an autism mentor/bus aide. (Tr. at 1146, 1148).

### III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. WeinBerger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for DIB through December 31, 2024. (Tr. at 54, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 23, 2019, the alleged disability onset date. (*Id*., Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: fibromyalgia, mixed tissue connective disease, osteoarthritis, lumbar spine disorder, lumbar radiculopathy, chronic obstructive pulmonary disease (COPD), restrictive airway disease, asthma, thyroid disorder, Raynaud's disease, and a history of left knee arthroscopy. (Tr. at 55, Finding No. 3). The ALJ also considered Claimant's breast cancer, hypertension, left heel spur, knee osteoarthritis, mild degenerative changes in her hands, dry eyes, meibomian gland disorder, degenerative changes of the cervical spine, toe lesions, anxiety disorder, panic disorder, post-traumatic stress disorder (PTSD), and depressive disorder, but the ALJ found that the impairments were non-severe. (Tr. at 55-58). The ALJ further concluded

that Claimant's carpal tunnel syndrome (CTS) was not a medically determinable impairment. (Tr. at 59).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 59-60, Finding No. 4). The ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can stand and walk four out of eight hours and sit[] for six out of eight hours in a workday. The claimant can occasionally climb ramps and stairs; can never climb ladders, ropes, and scaffolds; and can occasionally balance, stoop, kneel, crouch, and crawl. She is capable of tolerating occasional exposure to extreme cold, heat, wetness, humidity, atmospheric conditions as that term is defined in the Selected Characteristics of Occupations, and vibration. She must avoid all workplace hazards such as moving machinery or unprotected heights.

(Tr. at 61-66, Finding No. 5).

At the fourth step, the ALJ concluded that Claimant could not perform her past relevant work. (Tr. at 66-67, Finding No. 6). Therefore, the ALJ considered Claimant's past work experience, age, and education to determine whether she could engage in other substantial gainful activity. The ALJ considered that (1) Claimant was born in 1971 and was defined as a younger individual on her alleged disability onset date, but she subsequently changed age category to an individual closely approaching advanced age; (2) Claimant had at least a high school education; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled" regardless of whether she had transferable skills. (Tr. at 67, Findings 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as an office

helper, clerical checker, and information clerk. (Tr. at 67-68, Finding No. 10). Consequently, the ALJ decided that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 68, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant asserts several challenges to the Commissioner's decision. She argues that the ALJ erred in omitting any RFC limitations concerning Claimant's use of a cane; conflated the regulatory framework for evaluating her subjective symptoms with the RFC functional analysis in violation of *Dowling v. Comm'r of SSA*, 986 F.3d 377 (4th Cir. 2021); and did not properly assess her self-described limitations. (ECF No. 11).

In response, the Commissioner argues that substantial evidence supports the ALJ's finding that Claimant's use of a cane was not medically necessary, the decision read as a whole is distinguishable from *Dowling*, the ALJ explicitly considered all of the regulatory factors in evaluating Claimant's subjective allegations, and the RFC determination is supported by substantial evidence. (ECF No. 12). Plaintiff asserts in her reply brief that the ALJ failed to provide a logical bridge to her conclusion that Claimant's cane was not medically necessary. (ECF No. 13 at 2-3). Plaintiff also reemphasizes that the ALJ's RFC assessment is flawed for the same reasons identified in *Dowling* because the ALJ explicitly and exclusively relied on 20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 16-3p, which pertain only to the framework for evaluating Claimant's symptoms, instead of performing the function-by-function analysis to assess Claimant's RFC required by 20 C.F.R. § 404.1545 and SSR 96-8p. (*Id.* at 1-2).

## V.    Relevant Evidence

The undersigned thoroughly examined the entire record. Claimant did not assert any challenges regarding the ALJ's assessment of her mental impairments. Therefore,

that evidence is omitted from the following discussion, with only the most relevant evidence addressed below.

### A. Treatment Records

On May 6, 2019, Claimant presented to MedExpress South Parkersburg after hitting a deer one hour earlier. (Tr. at 1328). She complained of hip and low back pain that was radiating into her right leg. (*Id.*). There were no abnormalities on examination of her hip, but she had reduced flexion, extension, and rotation of her lumbar spine; paraspinal and sacroiliac joint tenderness; and muscle spasms in her lower back. (Tr. at 1329). In addition, Claimant's sensation was reduced in her right lower extremity and her straight leg raise test was positive at 45 degrees on the right. (Tr. at 1329-30). Her x-ray showed straightening of the normal lumbar lordosis, but no obvious fracture or acute bony abnormalities. (Tr. at 1348). Claimant was diagnosed with lumbago with sciatica on her right side and sprain of the sacroiliac joint. (Tr. at 1330).

On July 21, 2019, Claimant returned to MedExpress after dropping a can on her left foot while working as a cashier at Walmart. (Tr. at 1332). Her left foot was swollen with painful flexion, but her range of motion was unimpaired; gait, station, and sensation were normal; and x-ray showed no abnormalities. (Tr. at 1333). She was diagnosed with a left foot contusion. (*Id.*). Claimant returned to MedExpress for follow-up on July 26, 2019 regarding her left foot injury. She still had pain, swelling, and tenderness in her foot, but exhibited full strength against resistance and normal gait, stance, and sensation. (Tr. at 1336). She was advised to ice and elevate her foot and have a repeat x-ray if the injury did not improve in 10 to 14 days because a fracture was sometimes not apparent until the bones began to heal. (*Id.*).

On August 21, 2019, pain management physician Galal Gargodhi, M.D., evaluated

Claimant's complaints of lower back pain that radiated down her right side. (Tr. at 1446). She expressed that she suffered from the pain for a few months, and it was worsening. (*Id.*). She denied any numbness, tingling, or weakness in her lower extremities, and her gait was normal. (Tr. at 1446, 1447). Dr. Gargodhi concluded that Claimant's pain mostly stemmed from right sacroiliitis, and he scheduled her for steroid injections in that region. (Tr. at 1448). Claimant received her first right sacroiliac joint injection on September 5, 2019. (Tr. at 1445).

On September 18, 2019, Claimant presented to MedExpress for pain in her left ear, neck, and face after her grandson jumped up and hit her left ear and she felt a "pop." (Tr. at 1338). She complained of lateral tenderness in her neck and jaw. (Tr. at 1339). Her gait and stance were normal at that time. (*Id.*). Claimant was diagnosed with a contusion. (Tr. at 1340). Thereafter, on September 25, 2019, Claimant was evaluated by podiatrist Jana Atik, DPM, for continued issues regarding her left foot injury. (Tr. at 1442). Claimant stated that her foot was painful when pressure was applied and when she wore shoes, and she experienced numbness, tingling, and her toes getting "stuck" in a curled position. (*Id.*). Dr. Atik diagnosed Claimant with left foot pain, Lisfranc's sprain, and neuropathy. (Tr. at 1444). She prescribed a Cam boot and ordered an EMG and MRI. (*Id.*).

During follow-up with Dr. Arik on October 16, 2019, Claimant had reduced range of motion in her ankles, but full range of motion otherwise and full muscle strength in her feet. (Tr. at 1440). Her MRI taken on October 4, 2019 was grossly normal. (*Id.*). She was advised to proceed with the EMG and told that she could transition back to a tennis shoe. (*Id.*). Claimant received her second sacroiliac joint injection on October 17, 2019. (Tr. at 1437). On November 15, 2019, Claimant presented to the emergency department at Camden Clark Medical Center due to dizziness. (Tr. at 1432). Her examination showed

normal range of motion in her neck, back, and extremities, no tenderness or edema, and intact neurological findings. (Tr. at 1434). Imaging was negative for acute cardiopulmonary disease. (Tr. at 1436). Claimant was diagnosed with pleurisy and atypical chest pain and discharged with a prescription for cough medicine. (Tr. at 1436-37).

On November 27, 2019, Claimant followed up with her podiatrist. Her left foot still became numb with prolonged weightbearing. (Tr. at 1429). She noted that her foot was also swollen one day earlier because she was on her feet for about six hours while her daughter was in premature labor, but the swelling since improved. (Tr. at 1429). Claimant expressed that injections were helping her back pain. (Tr. at 1429). She had not participated in the EMG study because she had been sick and could not remain still without coughing. (*Id.*). Claimant's musculoskeletal/orthopedic examination was normal other than reduced range of motion in her ankles. (Tr. at 1431). Claimant was advised to wear compression stockings for edema with prolonged weightbearing and reschedule her EMG if her symptoms did not improve. (Tr. at 1431).

On December 2, 2019, Claimant advised Dr. Gargodhi that she experienced 90 percent pain relief from her two sacroiliac joint injections and was doing really well until recently when she moved and tried to do things with her grandson. (Tr. at 1426). Dr. Gargodhi recommended an ablation and physical therapy. (Tr. at 1428). Claimant's gait was normal during the visit. (*Id.*). Dr. Gargodhi performed a sacroiliac radiofrequency ablation on January 9, 2020, but Claimant expressed on February 19, 2020 that it did not provide any pain relief. (Tr. at 1625). Claimant had normal strength and sensation, but expressed pain when walking. (Tr. at 1627). Dr. Gargodhi ordered an MRI and x-rays. (*Id.*).

9

Claimant's lumbar MRI on February 28, 2020 showed moderate multilevel degenerative disc disease that was most pronounced at L5-S1 where she had a small right paracentral disc protrusion which appeared to touch the S1 nerve root and could account for the radicular symptoms; very mild central stenosis at L4-5; and moderate facet arthritis; and degenerative change involving a pseudo articulation at L5-S1. (Tr. at 1633). The x-ray of her sacroiliac joints showed that the joints were relatively well preserved despite very mild sclerosis, but there was an anomalous articulation between Claimant's left L5 traverse process and sacrum where she had some degenerative change and sclerosis, which could be responsible for her left-sided low back pain. (Tr. at 1633-34).

On March 4, 2020, Claimant presented to Casey Brunetti, PA-C. (Tr. at 1621). She complained of tenderness, pain, and spasm in her low back, but demonstrated normal range of motion and reflexes; no focal deficits, weakness, or atrophy; and intact gait. (Tr. at 1623-24). PA-C Brunetti scheduled Claimant for more steroid injections because they provided better relief than the ablation. (Tr. at 1624). An x-ray taken on July 13, 2020 showed mild degenerative changes in Claimant's left knee. (Tr. at 1404). On October 21, 2020, James Spychalski, M.D., prescribed Claimant a quad cane. (Tr. at 1728).

On November 17, 2020, Claimant was referred to neurosurgical provider Robyn Betts, NP, due to upper and lower extremity weakness. (Tr. at 1746). She displayed cervical and lumbar paraspinal tenderness and antalgic gait, although her muscle tone was intact with no abnormal movements or atrophy, she had full range of motion in her spine and muscle strength, and her reflexes and sensation were intact. (Tr. at 1749). Nurse Practitioner Betts ordered MRIs and an EMG. (Tr. at 1746). The EMG taken on December 8, 2020 showed mild chronic L5 radiculopathy bilaterally. (Tr. at 1731). The MRI of Claimant's cervical spine performed the same day showed moderate left and mild right

foraminal narrowing at C5-6 and mild right foraminal narrowing at C4-5, but no central stenosis or fracture. (Tr. at 1740).

Claimant met with Nurse Practitioner Betts and neurosurgeon Seyed A. Ghodsi, M.D., on January 6, 2021 to review test results. (Tr. at 1758). The providers noted that, regarding neck pain and radicular symptoms, Claimant's MRI did not show any severe pathology, and they recommended physical therapy and injections. (Tr. at 1758). They further explained that Claimant had degenerative changes in her lumbar spine, but no severe stenosis. (*Id.*). Thus, they recommended therapy and injections for her radiating lumbar pain as well. (*Id.*). The examination findings were the same as her previous visit. (Tr. at 1761).

On January 11, 2021, Claimant began physical therapy for neck, lower back, shoulders, hands, and knee pain. (Tr. at 1836). She reported muscle tenderness, weakness in her lower extremities, impaired lumbar range of motion, tight calf muscles, daily muscle spasms in her legs, and impaired balance and endurance. (Tr. at 1816). She ambulated with an antalgic gait but was not using an assistive device. (*Id.*). Claimant's therapist educated her on using a four-point cane when out of the house due to her high risk of falls at that time. (*Id.*). During an appointment on February 3, 2021, Claimant advised her podiatrist that she had been attending physical therapy twice per week. (Tr. at 2147). Her sensation was intact, and she had full muscle strength. (Tr. at 2150-51).

Claimant was referred to rheumatologist Tamara Postlethwait, APRN, on March 10, 2021 regarding Raynaud's disease. (Tr. at 1994). Claimant reported that she sometimes had difficulty walking due to stiffness and her joints sometimes hurt so badly that she had problems going up stairs. (Tr. at 1994-95). Nurse Practitioner Postlethwait opined that Claimant's symptoms may be associated with fibromyalgia and ordered

testing. (Tr. at 1997). The x-rays of Claimant's knees showed mild degenerative changes. (Tr. at 2133). Examination of Claimant's right knee on March 23, 2021 by orthopedic physician assistant Brook E. Morgan, PA-C, revealed no erythema, effusion, or tenderness. (Tr. at 2163). She had full range of motion in the knee that was mildly painful, full strength in her right lower extremity, and stability to valgus and varus stress. (*Id.*).

Nurse Practitioner Postlethwait met with Claimant on March 24, 2021 to go over the laboratory results. She diagnosed Claimant with fibromyalgia and osteoarthritis in her hands and feet, and she prescribed Flexeril and meloxicam. (Tr. at 2091, 2093). Claimant reported to Nurse Practitioner Postlethwait on April 27, 2021 that she developed gastrointestinal issues and dizziness since starting Flexeril and Meloxicam, but her body tenderness was improved. (Tr. at 2193). Her prescriptions were switched to Zanaflex and Elavil. (Tr. at 2195). On August 22, 2021, Claimant presented to the emergency department at WVU Medicine due to abdominal pain. (Tr. at 2263). She exhibited normal range of motion and no edema, tenderness, or focal deficits. (Tr. at 2267). She moved with "full ambulation." (Tr. at 2261).

### B. Evaluations, Opinions, and Prior Administrative Findings

On July 13, 2020, Deidre Parsley, D.O., performed a consultative examination of Claimant. (Tr. at 1407). Claimant ambulated with a slow antalgic gait that was not unsteady, lurching, or unpredictable. (Tr. at 1408). She did not require a handheld assistive device, was stable at station, and felt comfortable in the sitting position, but uncomfortable in the supine position. (*Id.*). Claimant exhibited tenderness and very mild swelling in her left knee, positive right straight leg raising tests, and lumbar pain during range of motion testing. (Tr. at 1409). She could stand on her right leg with a little imbalance and was unsteady on her left leg; could not walk on her heels or toes; had

12

difficulty performing the tandem gait test; and could only half squat due to low back pain. (*Id.*). Dr. Parsley diagnosed Claimant with chronic lumbalgia with radiculopathy and bilateral knee pain. (*Id.*).

On October 7, 2020, Atiya M. Lateef, M.D., assessed based upon her review of the record that Claimant could perform light exertional work with occasional postural activities except for no climbing of ladders, ropes, or scaffolds, and no concentrated exposure to temperature extremes, wetness, humidity, vibration, or fumes or any exposure to hazards. (Tr. at 991-92). Thomas Lauderman, D.O., affirmed those findings on December 8, 2020. (Tr. at 1008-11).

### C. Claimant's Statements

In a function report dated February 2, 2020, Claimant stated that her daughter-in-law took her to medical appointments and the store most of the time. (Tr. at 1165). As far as daily activities, Claimant reported that she sometimes did not "feel up to" getting dressed, and she often put her hair up in a "messy bun" rather than fixing it. (*Id.*). Sometimes, her hands were so swollen that she needed to have someone tie her shoes and open her bottles of water and medicine bottles. (*Id.*). She made simple meals two to three times per week, and her family members also prepared food for her. (Tr. at 1166). She folded clothes, put dishes in the dishwasher, made her bed, checked the mail, and swept the concrete pad by her front door. (*Id.*). It took her approximately five minutes to make her bed every day, and she swept one to three times per week. (*Id.*). Claimant stated that she drove and could go out alone. (Tr. at 1167). She shopped in stores, as well as by computer. (*Id.*). She shopped once or twice per week, if needed, and made a list so that she was only in the store for an hour or less. (*Id.*). She attended church twice per week. (Tr. at 1168).

13

In a subsequent function report dated November 25, 2020, Claimant asserted that she sometimes needed help with her socks and shoes, her daughter-in-law helped her with her hair when needed, and she required assistance up and down from the toilet when she had "flare ups." (Tr. at 1196). She sometimes prepared small meals for 15 minutes and took breaks when making "some stuff." (Tr. at 1198). She folded clothes for 15 minutes twice per week and put dishes in the dishwasher for 10 minutes three to four times per week. (*Id.*). Her son carried the laundry upstairs for her, and her family did most of the housework and yardwork. (*Id.*). Claimant still drove herself and went out alone when her son or daughter-in-law could not take her. (Tr. at 1199). She went to church once or twice per month. (Tr. at 1200). She used a cane when walking. (Tr. at 1203).

Claimant testified during her administrative hearing on March 8, 2022 that she could not work because she could not walk very well, had trouble moving without lots of pain, and suffered from swollen joints. (Tr. at 967). She claimed to have her cane with her at all times and use it every day to stabilize herself when walking. (Tr. at 970-71). Claimant testified that the most that she generally walked was approximately 20 feet to the bathroom. (Tr. at 974). Her son or daughter-in-law usually drove her to medical appointments, and she sometimes had to stop and sit for a few minutes when walking inside. (*Id.*).

## VI.  Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his or her decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

Claimant's challenges concern the ALJ's assessment of her RFC and subjective symptoms.

### A. RFC

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a

function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at \*3.

The functions which the ALJ must assess include a claimant's physical abilities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); mental abilities, such as understanding, remembering, and carrying out instructions and responding appropriately to supervision, coworkers, and work pressures in a work setting; and other abilities, such as seeing and hearing. 20 CFR § 404.1545(b)-(d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at \*3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at \*4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at \*7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at \*7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested"

functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### 1. Cane

Claimant argues that the ALJ erred by not including an RFC limitation to account for her use of a cane. (ECF No. 11 at 1). In assessing a claimant's RFC, an ALJ must consider the impact of a "medically required" hand-held assistive device. SSR 96–9p, 1996 WL 374185, at *7. Although SSR 96-9P addresses the use of a hand-held assistive device by individuals capable of less than a full range of sedentary work, district courts within the Fourth Circuit have consistently referred to SSR 96-9P for direction when a claimant alleges that the ALJ failed to properly consider his or her use of a hand-held assistive device in the RFC analysis. *Daniels v. Saul*, No. 2:20-CV-00230, 2021 WL 667945, at *8 (S.D.W. Va. Jan. 26, 2021), *report and recommendation adopted,* No. 2:20-CV-00230, 2021 WL 665534 (S.D.W. Va. Feb. 19, 2021).

A hand-held assistive device is "medically required" when there is "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96–9p, 1996 WL 374185, at *7. A prescription for an assistive device is not dispositive in an ALJ's evaluation of medical necessity. *See, e.g., Wanda H. v. Kijakazi*, No. 3:22-CV-00539 (DJN), 2023 WL 5519349, at *15 (E.D. Va. Aug. 9, 2023), *report and recommendation adopted,* No. 3:22CV00539 (DJN), 2023 WL 5510311 (E.D.

Va. Aug. 25, 2023).

As SSR 96-9P emphasizes, medical documentation establishing the need for a hand-held assistive device is important not only to establish medical necessity, but also to identify the circumstances for which the device is needed. The particular facts of the case are critical, because even when a hand-held device is medically necessary, its use may not significantly erode the occupational base at issue. *Id*. If an ALJ finds that an assistive device, such as a cane or walker, is not "medically necessary," the ALJ is not required to include the use of the cane or walker in the claimant's RFC. *Fletcher v. Colvin*, No. 1:14-CV-380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015). "It is well-settled that a claimant bears the burden of establishing that a cane is medically necessary." *Lumpkin v. Comm'r of Soc. Sec.*, No. 4:17-CV-00030, 2019 WL 1264890, at *4 (W.D. Va. Mar. 19, 2019), *aff'd*, 808 F. App'x 210 (4th Cir. 2020).

In this case, the ALJ considered Claimant's prescription for a quad cane in October 2020, but the ALJ found that the cane was not medically necessary because the prescription did not specify the extent that it was required, and the record did not document significant gait dysfunction. (Tr. at 64-65). The ALJ noted with specific citations to the record that Claimant did not require the use of an assistive device during her July 2020 consultative examination, and other records after her cane prescription described her as having an intact gait. (Tr. at 65). For instance, Claimant was described as having full ambulation in August 2021. (*Id*.). The ALJ concluded that, although Claimant was documented to have an antalgic gait in the record, there was no discussion of her using an assistive device subsequent to the prescription. (*Id*.). Thus, the ALJ found that the record did not support a finding that the cane was medically necessary. (*Id*.).

Claimant contends that the ALJ's analysis was flawed because the ALJ largely

18

relied on evidence predating her prescription for a cane and ignored contrary evidence that showed it was medically necessary, such as the fact that Claimant's physical therapist instructed her to use a cane outside of the house due to her high risk of falls. (ECF No. 13 at 2-4). According to Claimant, the record is replete with objective evidence of her weakness, instability, and other issues that supports her need to use a cane. (ECF Nos. 11 at 4-5, 13 at 3-4). However, while Claimant might disagree with the outcome, the ALJ explicitly considered the relevant evidence and concluded that Claimant did not meet her burden of showing that the cane was medically necessary. The analysis is supported by substantial evidence. To begin, Claimant did not offer "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing *and describing the circumstances* for which it is needed." *Darlene W. v. Kijakazi*, No. 3:20-CV-00061, 2022 WL 594397, at *9 (W.D. Va. Feb. 28, 2022), *report and recommendation adopted,* 2022 WL 943955 (W.D. Va. Mar. 29, 2022) (citing SSR 96-9p, 1996 WL 374185). Dr. Spychalski signed an equipment order for a quad cane, stating that he examined Claimant on October 21, 2020. (Tr. at 1728). The prescription did not elaborate upon the circumstances that Claimant needed to use the cane. In fact, there is no documentation from any acceptable medical source in the record regarding how often or for what purposes the cane was needed, such as "whether all the time, periodically, or only in certain situations," the distances and type of terrain for which it is required, and "any other relevant information." *Darlene*, 2022 WL 594397, at *9.

Claimant emphasizes that her physical therapist noted on January 11, 2021 that Claimant should use her four-point cane when out of the house due to her high risk of falls at that time. (Tr. at 1816). However, even if the physical therapist's statement "when out of the house" sufficiently described the circumstances that she believed that Claimant

needed to use a cane, physical therapists are not acceptable medical sources and the ALJ concluded, based on the totality of the evidence, that Claimant did not establish that the cane was medically necessary. *Dziok v. Berryhill*, No. 1:15CV403, 2018 WL 6243090, at *5 (M.D.N.C. Nov. 29, 2018).

Namely, the ALJ noted that Claimant did not require an assistive device during her consultative examination, which was only a few months before Claimant was prescribed a cane. (Tr. at 65). Also, the ALJ noted that other records in 2019 and 2020 described Claimant as having an intact gait and she had "full ambulation" in August 2021. (*Id.*). The ALJ acknowledged that Claimant was noted to have antalgic gait within the record, but there was no mention of any use of an assistive device despite her prescription. (*Id.*). Claimant does not point to any medical documentation to the contrary. Although she was prescribed a cane and her physical therapist advised her on one occasion to use it when outside of her house, there is no evidence in any of her clinical records or evaluations that she actually used or needed to use it.

To the extent that Claimant suggests that the ALJ improperly considered evidence predating her prescription for a cane, there was not an acute medical event noted in the record that prompted the prescription for a cane or any significant medical change that made the prior records irrelevant. Claimant fails to show how her examinations, particularly those less than three months before she was prescribed a cane, were not material to the issue of whether the cane was medically necessary. Moreover, the ALJ also considered evidence after Claimant was prescribed a cane, including that she was never documented using it and was noted to have full ambulation.

Claimant is ultimately asking the Court to scrutinize the record and reach different conclusions than the ALJ, which is not permitted on judicial review. The ALJ expressly

considered the findings of antalgic gait and other abnormalities that Claimant points out but determined that Claimant could still fully ambulate in August 2021, and there was minimal mention of an assistive device after Claimant was prescribed a cane. Consequently, there is more than a scintilla of evidence to support the ALJ's determination that Claimant did not medically require the use of a cane despite her impairments. Although she had limitations, her muscle tone and strength, sensation, and reflexes were intact; her MRIs, EMG, and x-rays did not show any severe pathology; and none of her medical providers mentioned her using a cane and, in fact, expressly noted at various times that she was not using one. (Tr. at 1731, 1740, 1749, 1758, 1761, 1816, 2133, 2150-51, 2163, 2261, 2267).

Therefore, the undersigned **FINDS** that the ALJ's RFC analysis of whether Claimant's cane was medically necessary is supported by substantial evidence.

### 2. *Dowling* case

Claimant also argues that the ALJ's RFC assessment is deficient for the same reasons identified in *Dowling v. Comm'r of SSA*, 986 F.3d 377 (4th Cir. 2021). (ECF No. 13 at 1). According to Claimant, the ALJ improperly conflated the RFC assessment with the evaluation of symptoms, treating them as one and the same. (*Id*. at 2). In *Dowling*, the Fourth Circuit concluded that the ALJ relied on an incorrect regulatory framework when he assessed the claimant's RFC. *Dowling*, 986 F.3d at 388. The Court explained:

> [The ALJ] did not cite to 20 C.F.R. § 416.945, the section of the Code of Federal Regulations that is titled "Your residual functional capacity" and explains how ALJs should assess a claimant's RFC. Nor did he cite to SSR 96-8p, the 1996 Social Security Ruling that provides guidance on how to properly evaluate an RFC. Finally, the ALJ did not indicate that his RFC assessment was rooted in a function-by-function analysis of how Appellant's impairments impacted her ability to work. Instead, the ALJ's RFC determination was based entirely on SSRs 96-7p and 16-3p, which set out the process ALJs use to "evaluate the intensity and persistence of [a

claimant's] symptoms" and determine "the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the [ ] record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Of course, a claimant's symptoms, and the extent to which the alleged severity of those symptoms is supported by the record, is relevant to the RFC evaluation. *See* 20 C.F.R. § 416.945(a)(3) (stating that when evaluating an RFC, an ALJ should consider "limitations that result from [the claimant's] symptoms, such as pain"). But an RFC assessment is a separate and distinct inquiry from a symptom evaluation, and the ALJ erred by treating them as one and the same.

*Id.* at 387.

The ALJ's decision in this case is plainly distinguishable from the decision in *Dowling*. Here, the ALJ clearly identified the correct regulatory framework for assessing Claimant's RFC earlier in the decision. (Tr. at 54) (discussing 20 C.F.R. §§ 404, 1520(e), 404.1545 and SSR 96-8p). More importantly, although the ALJ did not repeat those sources in the RFC portion of the decision, the ALJ very clearly performed a thorough function-by-function analysis and logically connected the evidence to each RFC limitation that she assessed. *See, e.g., Michelle T. v. Kijakazi*, No. 2:23-CV-00176, 2023 WL 5811259, at *11 (S.D.W. Va. Aug. 17, 2023), *report and recommendation adopted,* 2023 WL 5804316 (S.D.W. Va. Sept. 7, 2023) (finding no error when the ALJ only cited the RFC framework in a "boilerplate introductory section" of the decision, but nonetheless performed the functional analysis); *Davis v. Comm'r of Soc. Sec.*, No. 3:20-CV-00339-RJC, 2022 WL 680211, at *4 (W.D.N.C. Mar. 7, 2022) ("Here, the ALJ, like the ALJ in the *Dowling* case, did not cite to 20 C.F.R. § 416.945 or SSR 96-8p. However, unlike the ALJ in the *Dowling* case, the ALJ here went through a function-by-function analysis. [...] The ALJ supported his functional analysis with medical and other record evidence. Tellingly, Plaintiff failed to identify any specific functional area that the ALJ failed to address and instead relied on generalized, conclusory arguments. Thus, to the extent the ALJ's

analysis is deficient in some way by, for example, not citing to the correct source, there is no per se rule for remand and such error is harmless as the ALJ went through a function-by-function analysis as required by the framework and Plaintiff failed to specify a non-harmless error."); *Elizabeth T. v. Kijakazi*, No. CV 21-1046-BAH, 2022 WL 2649055, at *3 (D. Md. July 8, 2022) ("I also do not find this case to be similar to *Dowling*. In *Dowling*, the Fourth Circuit found error in an ALJ's RFC assessment because the ALJ failed to engage in a "function by function" analysis as required by controlling precedent. [...] Unlike *Dowling*, the ALJ here engaged in a lengthy "three step process" by considering all of Plaintiff's impairments, providing a sufficient narrative discussion regarding each, and making a finding as to the Plaintiff's RFC.").

In this matter, the ALJ explained that Claimant's lumbar degenerative disc disease restricted her to light exertional work, and her fibromyalgia and osteoarthritis symptoms in combination with her back impairment resulted in specified standing, walking, and postural RFC restrictions. (Tr. at 64). The ALJ discussed that Claimant's respiratory impairments also restricted her to standing and walking for only four hours in an eight-hour workday to prevent exacerbating or triggering respiratory symptoms. (Tr. at 65). The ALJ explained that osteoarthritis restricted Claimant to occasional crawling to avoid exacerbation of hip or knee pain, and Claimant could never climb ladders, ropes, or scaffolds due to dizziness that she suffered from medication and osteoarthritis in her lower extremities. (Tr. at 63). The ALJ also stated that Claimant's fibromyalgia limited her to occasional exposure to extreme temperatures, wetness, humidity, and vibration to prevent exacerbation of symptoms such as joint pain. (*Id.*). Claimant's Raynaud's disease affecting her hands and feet restricted her to occasional exposure to extreme cold, but the record did not establish significant hand dysfunction warranting manipulative

limitations. (*Id.*). The ALJ assessed that Claimant's medication side effect of dizziness precluded her from exposure to workplace hazards such as moving machinery and unprotected heights. (*Id.*). In addition, to avoid exacerbating or triggering respiratory distress, Claimant could only have occasional exposure to extreme temperatures, atmospheric conditions, and wetness. (Tr. at 65). Importantly, the ALJ bolstered the above RFC analysis with specific references to the record. The ALJ further explained how the opinion evidence, prior administrative findings, and Claimant's daily activities factored into the RFC findings. (Tr. at 65-66).

Therefore, there is no merit to Claimant's argument that the RFC assessment suffers from the same flaws that the Fourth Circuit identified in *Dowling*. The ALJ performed a "separate and distinct" RFC analysis, which was not based entirely on her evaluation of the intensity, persistence, and limiting effects of Claimant's symptoms. The ALJ explicitly connected the evidence, on a function-by-function basis, to the RFC findings.

Consequently, the undersigned **FINDS** that the RFC assessment is supported by substantial evidence.

### B. Subjective Symptoms

Claimant argues that the ALJ did not properly evaluate her subjective symptoms because the ALJ relied on selective evidence, did not consider her "stellar work history," and required objective evidence of the limitations that Claimant alleged. (ECF No. 11 at 15-19). Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. § 404.1529 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically

determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and

aggravating factors, medication or medical treatment and resulting side effects received

to alleviate symptoms, and other factors relating to functional limitations and restrictions

due to the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1)-(3); *see also Craig*, 76 F.3d

at 595; SSR 16-3p, 2016 WL 1119029, at \*4-\*7.

SSR 16-3p provides further instruction on what type of evidence should be

considered when the intensity, persistence, or severity of the symptoms cannot be

established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at \*6. The ruling

presents an extensive list of evidence that may prove probative and notes that valuable

evidence to consider may include (1) a longitudinal record of any treatment and its success

or failure, including any side effects of medication and (2) indications of other

impairments, such as potential mental impairments, that could account for an

individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited
> solely because they are not substantiated by objective evidence of the pain
> itself or its severity, they need not be accepted to the extent they are
> inconsistent with the available evidence, including objective evidence of the
> underlying impairment, and the extent to which that impairment can
> reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's

allegations of intensity and persistence solely because the available objective medical

evidence does not substantiate the allegations; however, the lack of objective medical

evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at \*5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement

that 'the individual's statements about his or her symptoms have been considered' or that

'the statements about the individual's symptoms are (or are not) supported or consistent.'

26

It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ performed the two-step process. The ALJ considered Claimant's allegations regarding her inability to walk very well or move without pain; using a cane "most of the time;" having swollen joints and pain in her shoulder, lower

back, and right hip; Reynaud's disease; and breathing problems. (Tr. at 61-62). The ALJ considered the medications and treatment that Claimant received, including a prescription for Flexeril. (Tr. at 61). The ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 62). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with the collective record. (*Id*.). The ALJ explained that Claimant's fibromyalgia was quickly improved with medication, her respiratory impairments were largely controlled with medications as shown by unremarkable respiratory examinations, and Claimant's osteoarthritis and lumbar pain responded well to medication and injections. (*Id*.). Claimant asserts four particular errors in the subjective symptom analysis, which are considered below.

### 1. Daily Activities

The ALJ discussed that Claimant's ability to perform household chores, perform self-care duties, shop in stores, and attend church did not support any greater limitations than those indicated in the decision. (Tr. at 66). Claimant argues that the ALJ's analysis of her daily activities is based on highly selective discussion of the record, which, at best, only proved that she could perform isolated, sporadic tasks. (ECF No. 11 at 15). Claimant points to her allegations that she could do a limited amount of housework such as folding clothes and doing dishes, but she had to sit down while doing things around the house due to pain, and her son and daughter-in-law did most of the housework. (*Id*.). Also, Claimant notes that there are times when she does not feel like getting dressed, someone must help her put on her socks and shoes and care for her hair, and someone must help her with toileting during flareups. (*Id*.). Finally, she notes that she only shops in stores once or twice per week for an hour or less, and attends church once or twice per month,

28

although she used to go twice per week. (*Id*.). In Claimant's view, her description of daily activities is supported by objective evidence, all of which can only support a finding that she is disabled. (*Id*. at 16).

Undoubtedly, an ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them. *Oakes v. Kijakazi*, 70 F.4th 207, 216 (4th Cir. 2023) (citing *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)). In *Arakas*, the Fourth Circuit cautioned that "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Arakas v. Comm'r, Soc. Sec. Admin*., No. 19-1540, 2020 WL 7331494, at *9 (4th Cir. Dec. 14, 2020) (citation and markings omitted). For instance, an ALJ cannot selectively cite evidence concerning the tasks that a claimant can perform while improperly disregarding qualifying or contrary evidence regarding the claimant's ability to perform those tasks. *Id*. at *11.

In the instant decision, the ALJ did not misrepresent or cherrypick the facts in order to present a false picture of Claimant's abilities. The decision as a whole clearly indicates that the ALJ considered the extent to which Claimant was limited in performing her daily activities and provides a logical bridge to the ALJ's conclusions. Indeed, earlier in the decision, the ALJ explicitly noted that Claimant discussed having assistance from family members. (Tr. at 58). Although the ALJ did not reiterate it in the RFC analysis, that restriction was clearly considered and articulated in the decision. *Lora H. v. Kijakazi*, No. 2:22-CV-00211, 2022 WL 18717795, at *13 (S.D.W. Va. Nov. 2, 2022), *report and recommendation adopted sub nom. Hogan v. Kijakazi,* 2023 WL 2025239 (S.D.W. Va. Feb. 15, 2023).

Furthermore, there is no rigid requirement that the ALJ explicitly mention every piece of evidence or qualifying statement about the extent to which a claimant can perform daily activities. *Footman v. Kijakazi*, No. 21-1116, 2023 WL 1794156, at *2 (4th Cir. Feb. 7, 2023). The issue that necessitated remand in *Arakas* and similar decisions was that the ALJ overstated and misrepresented claimant's daily activities based on select facts in order to deny disability, and an accurate view of the record as a whole did not support it. *Prudich v. Saul,* No. CV 1:20-00019, 2021 WL 933864, at *6 (S.D.W. Va. Mar. 11, 2021); *Ball v. Kijakazi,* No. 2:21-CV-00027, 2022 WL 883036, at *11 (S.D.W. Va. Mar. 3, 2022), *report and recommendation adopted,* 2022 WL 880004 (S.D.W. Va. Mar. 23, 2022). The "cases make clear that it is insufficient merely to point to minimal daily activities as proof that a claimant is not disabled" because, as the Fourth Circuit explained in *Arakas*, "claimants should not forfeit Social Security benefits for trying to 'participate in the everyday activities of life.'" *Prudich*, 2021 WL 933864, at *7 (quoting *Arakas*, 983 F.3d at 101).

Here, by contrast, Claimant is asking the Court to reweigh evidence and reach different conclusions than the ALJ. The ALJ considered the relevant evidence and ultimately determined that the activities that Claimant could perform, even with the limitations that she alleged, supported no greater restrictions. (Tr. at 66). Claimant maintains that the fact that she could perform sporadic daily activities was not inconsistent with a claim for disability. However, the ALJ did not adjudge her non-disabled solely based on her ability to perform some activities. It was one of many factors that the ALJ considered in evaluating Claimant's subjective symptoms and RFC. *Cf. Langston v. Comm'r of Soc. Sec. Admin.*, No. 22-1257, 2023 WL 1519521, at *4 (4th Cir. Feb. 3, 2023) (finding error where the ALJ discredited the claimant's assertions of

disabling pain based largely on her ability to perform modest daily activities). Therefore, the undersigned finds no error in the ALJ's analysis of Claimant's daily activities.

### 2. Other Factors

Claimant points to record evidence of her low back pain; lower extremity symptoms; and treatment. (ECF No. 11 at 16-17). She appears to argue that, if properly considered, that evidence only supports a finding that she was disabled. (*Id.*). This argument is without merit. In assessing Claimant's subjective symptoms, the ALJ considered the evidence that Claimant cited in conjunction with all of the evidence in the record. (Tr. at 62-66). Claimant does not identify any critical conflicting evidence that the ALJ failed to consider in this regard. She simply asks the Court to review the evidence and reach independent conclusions regarding the intensity, persistence, and limiting effects of her symptoms. As noted, that is not the Court's role in reviewing the Commissioner's decision and does not warrant reversal or remand.

### 3. Work History

Claimant argues that the ALJ erred in not considering her 29-year uninterrupted "stellar work history," including 19 consecutive years at the Wood County Board of Education. (ECF No. 11 at 17). In evaluating the intensity and persistence of a claimant's symptoms, such as pain, and determining the extent to which the symptoms limit the person's capacity for work, the ALJ considers evidence such a person's work record. 20 C.F.R. § 404.1529(c)(3); SSR 16-3P, 2016 WL 1119029, at *5. The ALJ plainly did so in this case. She specifically questioned Claimant about her work history during the administrative hearing and evaluated Claimant's symptoms based on the "collective record," which included all of the information that Claimant submitted regarding her earnings and work history. (Tr. at 62, 967, 1121-42, 1207-15, 1243). Claimant does not

identify any authority which required the ALJ to elaborate on her work history any further. *Lora H.*, 2022 WL 18717795, at *15.

### 4. Objective Evidence

As a final matter, Claimant argues that the ALJ improperly increased her burden of proof by requiring her subjective description of her symptoms to be supported by objective medical evidence. (ECF No. 11 at 18-19). This challenge is similarly unfounded. The ALJ did not discount Claimant's fibromyalgia based on objective evidence, as was the case in *Arakas*. (Tr. at 62). In fact, the ALJ expressly considered objective evidence to substantiate Claimant's fibromyalgia. *Charlene S. v. Saul*, No. CV DLB-20-853, 2021 WL 2141501, at *4 (D. Md. May 26, 2021) (discussing that objective evidence cannot be used to discount fibromyalgia symptoms, but it can be used to substantiate it). There is also no indication that the ALJ discredited Claimant's other alleged symptoms based on objective evidence alone. The ALJ expressly considered not only the objective findings in relation to Claimant's pain, but Claimant's statements to providers, methods of treatments, the opinion evidence, and daily activities. (Tr. at 63-66). The ALJ very clearly did not discredit Claimant's complaints simply based on "lack of objective evidence corroborating them." *Oakes v. Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) (citation omitted).

For all of the above reasons, the undersigned **FINDS** that the subjective symptom assessment is supported by substantial evidence.

### VIII. Proposal and Recommendations

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 11); **GRANT** Defendant's request to affirm the

decision of the Commissioner, (ECF No. 12); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** October 4, 2023

Cheryl A. Eifert
United States Magistrate Judge